Filed 9/9/15  P. v. Flores CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060209 |
| v. | (Super.Ct.No. BLF1100204) |
| JESSE JAMES FLORES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Richard A. Erwood, Judge.  Affirmed.

Ellen M. Matsumoto, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Jessie James Flores appeals after he was convicted of murder and other crimes in the shooting death of Jane Doe.  Defendant urges that his trial counsel was incompetent in failing to file a disqualification of the trial judge; no one realized until after the trial and sentence that the trial judge had formerly been a prosecutor who appeared at arraignment on defendant's 1998 strike offense.  Defendant also argues that it was a violation of his right to due process to permit the trial court to preside in this case, particularly as to the request to dismiss the strike prior in the interest of justice.  (See *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.)  We affirm.

## FACTS AND PROCEDURAL HISTORY

Jane Doe, the victim, had been in a relationship with defendant for about seven years.  Together, they had three children:  six-year-old Jessie, four-year-old J., and two-year-old Jillian.  Defendant and his family occupied the back bedroom of Jane Doe's mother's house.  Jane Doe's mother, father, her brother Oscar, and a sister, Susana, also lived in the house.  The bedroom occupied by defendant and his family had two doors:  one opened onto the hallway in the house; the other led to the backyard.

On the evening of August 11, 2011, another of Jane Doe's sisters, F., came to the house to visit their mother.  F. and her mother were talking in the mother's bedroom when Jane Doe came in.  Jane Doe was upset and crying.  Soon afterward, defendant also came to the mother's bedroom.  Defendant angrily ordered Jane Doe to return to their bedroom.  Jane Doe and her mother told defendant to leave the room.  He went back to his family's bedroom; reluctantly, Jane Doe went with him.

2

Behind the closed door of defendant's and Jane Doe's bedroom, noise erupted. Jane Doe yelled at defendant to "stop" what he was doing. The other family members present, F., Oscar, and their mother, rushed to the back bedroom and tried to open the door. It was locked or blocked; F., Oscar and their mother were only able to partially force the door open. Through the crack in the doorway, F. could see that defendant had Jane Doe pinned on the floor against the wall with one hand, and held a shotgun on her with the other. Jane Doe was trying to push defendant away.

F., Oscar, and their mother finally were able to push their way into the room. Defendant's three children also ran into the bedroom. Jane Doe's mother tried to wrest the shotgun from defendant, but he was able to shove her outside into the backyard. F. and Oscar left the room to find a phone and call 911. When F. returned, Jane Doe was on the floor, still struggling with defendant for control of the shotgun. When Jane Doe released her grasp on the barrel of the gun, defendant put the shotgun to her chest and fired. Defendant threw the shotgun onto the bed and fled out the back door.

Jane Doe died as a result of the shotgun wound. Defendant took refuge at his cousin's house where he was discovered and arrested several days after the shooting.

Defendant was charged with one count of first degree murder, one count of being a felon in possession of a firearm, and three counts (one for each of his children) of child endangerment.

A few days after the shooting, Oscar found a portfolio containing several pages of defendant's writings. Defendant had written a long and rambling statement, an extended

3

apologia for an apparent intention to kill both Jane Doe and himself.[1]  Among other

things, he wrote that he did not want to be without her.  If she pushed him away, it would

    **1** The writing consisted of 15 handwritten pages, which were not dated or signed (and which contained many spelling, punctuation and grammatical errors which are set forth hereafter).  The writing was admitted at trial as exhibit 26A.  Defendant admitted that the writing was his.

    Defendant wrote that he knew what he intended to do was wrong, but that he had gotten to a point that he "could not take it no more," and that he "had no choice" but it was "time for me to roll out," and that he was "sorry but sometimes the world is so cruel to people."  Defendant apologized that he "had to take a life with me," but that "it's the only thing that I really had in the world," although "she [presumably, Jane Doe] was n mine to begin with."  Defendant wrote that he now understood why people did things "like this when I watch the news and Americas most wanted," when they lose "the only thing in this world" that they care about.

    Defendant felt ignored and unheard, and all his dreams had been shattered.  He tried very hard to make things right, but was unable to do so.  Defendant felt that others kept him and Jane Doe ("my only love") apart.  He did not want to do what he contemplated "but I was at the edge."  Defendant wrote that "I have killed not wantin to but had to for I have a heart," and he "just did not no how to use it."  Defendant expressed love for his children and promised to see them "in another life."  Defendant said that "only God can and will judge me for what Ive done," and that he "had to follow thro with this mission for I can not tolerate with the situation of being ignored and hated by my people."

    Defendant hoped, "now that Im gone," that "everyone is happy," and that they would "understand[] what Ive done is for a good reason not just because."  Rather melodramatically, he asked that people not "shed any tears of sorrow" when "look[ing] in my casket."  Defendant said, "I write this with a smile cause Im headed home and theres a place for me some were up there."

    Defendant wrote an apology to his mother, and then explained that he "gave a warnin I wasn in my state of mind."  Defendant thanked Jane Doe for making him a better person, "but it came to late," for he "told her I will die and I will kill for her that's why Im here now."  He said, "some people can move on," but "not me [because] I have to much with her and I love her to death."  Defendant enjoyed his life with Jane Doe, but he "told her even if she found someone I wasn goin to let that happin nope shes mine and Im provin a point on that."  Defendant fretted that "she tells people she don't love me anymore," and "I no my girl wants someone else but I can't let that happin not as long a[s] Im alive."  He was not someone who could "just let things go just like that"; rather, he said, "not ever can I let her go."  He was very hurt when "she tells me she don't wanna be with me anymore."  He warned others to be careful what they say to people who love them, "so u don't end up in my shoez' hurtin people."

    Defendant asserted that "No one could not change my mind on what Im about to do," because "Im determined" and "I have lost my only family to something so dumbd."  He was determined not to leave the relationship:  "I think she is just watin for me to get up and leave on my own but that's not happin."  Instead, "I stick around so I can show her that I'm serious but if she don't believd or not it will be to late tho prosis [*sic*: process?] will be done."  Defendant

*[footnote continued on next page]*

*[footnote continued from previous page]*

placed the responsibility on Jane Doe for his actions, saying, "it's all in her hands on what will happin fatue [*sic*: fate? Future?] is in her hands not mine anymore."

Defendant related that he had "her name tattoed big on my back thats how sure I no she belong'z to me. And no one is going to chang that ever, twisted I am right now and twisted I will stay till it work'z out or until we are both gone Im not leavin without her." Defendant had his "mind . . . all ready set for this," and "Im just ready for this and for who ever gets this note please let other people no why I did what I did its called crazy love for someone." Defendant wrote that "my heart is pacin fast right now cause just known she will leave with me thats the only way Ill be at peace." Defendant "really hope[d] for simthin good for us but if ur readin this letter its cause it did'n happin." Defendant blamed others, saying, "I did not wish it to come down to this but [it] did thanks to all the people who put shit in her head that was not true just twistin shit up so she would leave me." Defendant warned that others "Should have just keept your mouth shut and this would have never happened but because everyone wants to lie and tell storys, this is what came out of your nonsence." Defendant blamed the circumstances of his growing up, and said that he wrote the letter so someone would tell his children that he loved them, but did not want them to be like him. Defendant did not want people to be shocked by what he intended to do, but his life was "ruined by haters." He was "tired of feelin this way," and lamented "all the people [who] always get into relationships that aint theres."

Defendant was upset that Jane Doe ignored him: "I cant even touch her without her pushin me away." He knew "she wants someone else[,] I can feel it." He knew that she would have gone already if she had met someone else, "but I no that I would not let it. Not as long as Im alive[.] Ill let that happin not over my dead body. I told her already what I was going to do[.] I no she don't believe me but when the time comez' she will find out but it will be to late." Defendant was at a "last point of not going back," and wrote that "Ive already told her my warning has been said if she dont take it then when the time is right it will happin. I look it now what ever happins, happins . . . at this point I leave it up to God's hands he no's what I wanna do."

Defendant continued later, musing that when he called to talk to Jane Doe, she would merely say, "what you want[?]" He thought she "really dont wanna be with me . . . but like I said before over my dead body she will be with another." He was hurt that she said she did not love him, "but one day I won't be able to take it anymore for only the Father can forgive me for what Ive done and what is to come but I guess that's just the way life goes."

Defendant wrote that "my mission is gettin closer and closer" and "I no it will happin soon." He felt he was giving full effort in the relationship, but Jane Doe was not. She listened too much to what others wanted to do. Defendant was "tired of all this shit," and felt he had "drawn the last straw." Defendant "tried to tell her what was goin to happin," but "she didn even see this comin but I did thats why I stand here alone to the grave." He claimed that he "tried not to call it quits but she pushed me to the edge," and prayed "please forgive me Father for my sins."

Defendant said, "what Ive done is not wrong hell no," and "I leave it in God's hands." He wrote, "I really don't care if you people hate me for what Im about to do," and blamed others for putting ideas in Jane Doe's head. Defendant said, "my fuse is getting shorter," and that "tomorrow I will go to the church and ask God for my forgiveness for what has happened and for

*[footnote continued on next page]*

be "too late." He resolved that he would not turn back; he would "blow her heart away so she feels no pain and suffering."

Evidence that came out at trial showed that, approximately two weeks before Jane Doe's death, defendant had confided to Jane Doe's sister, Susana, about the problems in his relationship with Jane Doe. Defendant stated that he intended to kill himself and Jane Doe; he had gone to church and talked to a priest and to God about it.

In another incident, about a month before the killing, defendant and Jane Doe had gone with some friends to the river so that defendant could teach Jane Doe how to shoot the shotgun. Defendant became jealous when he thought Jane Doe was trying to kiss her friend's brother, so he fired the gun at Jane Doe, grazing her leg with the shot.

Defendant testified on his own behalf at trial. He stated that he and Jane Doe had been arguing on the day of the killing. Jane Doe was packing defendant's belongings in a laundry basket and asking him to leave. She took the shotgun down from the shelf in the closet and put it in the laundry basket, presumably so that defendant would take the shotgun with him. Defendant testified that he was suicidal at the time. Defendant picked up the gun and declared that he wanted to kill himself. Jane Doe grabbed the barrel of the shotgun and tried to take it away. Jane Doe's mother and the children came into the

---

*[footnote continued from previous page]*
what is to come." He stated, "we all got to go and Im ready for it I dug Im [*sic*: my ?] own grave . . . ."

Defendant wrote that Jane Doe "don't no she is makin thing's worse by her pushing me away but for when it happins she will no but it will be to late cause theres no turning back[.] Ima blow her heart away so she feels no pain and sufferin but I will tell her I did it for love." Defendant felt that "this is what God wants me to do. This was my mission in life . . . ."

6

room while he and Jane Doe were fighting for possession of the shotgun; Jane Doe's mother also joined in the struggle over the gun. During the struggle, the shotgun was in constant motion, pointing "everywhere." Defendant testified that the gun suddenly went off; defendant did not purposely shoot Jane Doe, and he believed that he did not have his finger on the trigger. Even though the killing was unintentional, defendant ran away because he panicked.

Defendant explained that the writings Oscar had found had been written a few weeks earlier, before a period when he and Jane Doe had separated. Defendant was depressed, and he felt "down and out" at that time. Then he and Jane Doe were separated for a couple of weeks. About two weeks before the killing, he and Jane Doe had reconciled, and were getting along well together. Although defendant had written statements to the effect that he would kill Jane Doe and himself, he testified that he had no plans to actually do so. He "was just scribbling stuff down." He did not really plan to kill himself, but he was "just saying that," so that Jane Doe would feel sorry for him.

After the charges were initially filed, defense counsel requested appointment of a mental health professional to provide her with a report concerning a possible insanity defense. The court appointed Dr. William H. Jones. (Evid. Code, § 1017.) About six weeks later, the court declared a doubt as to defendant's competence to stand trial, and asked Dr. Jones to provide a report to the court pursuant to Penal Code section 1368. The court later appointed Dr. Michael C. Leitman to provide a second opinion on defendant's competency to stand trial, and, after many delays, reappointed Dr. Leitman to file an

7

updated competency evaluation. At the competency hearing, the court found defendant competent to stand trial and resumed the criminal proceedings.

After the preliminary hearing, defendant was held to answer on all charges. At arraignment on the information, he pleaded not guilty but later amended the plea to not guilty, and not guilty by reason of insanity. The court appointed Dr. Anna Molnar and Dr. Robert L. Suiter to provide reports to the court pursuant to Penal Code sections 1026 and 1027. At trial, the sanity phase was to be tried separately from the guilt phase, and defendant requested a court trial on his priors.

The jury found defendant guilty as charged on all counts, and found true as to the first degree murder that defendant had personally used a firearm to commit the offense. After the guilt phase, defendant withdrew his plea of not guilty by reason of insanity. The truth of the prior conviction allegations was tried to the court. The People submitted a certified copy of the case printout in defendant's 1998 burglary conviction, which conviction was the basis of both the strike allegation and the prior serious felony conviction enhancement. The court admitted the case printout into evidence as exhibit 36. The court found true that defendant had suffered a strike prior, the burglary conviction in 1998. (Pen. Code, § 667, subds. (c), (e)(1).) The also court found true an allegation that the same 1998 burglary offense constituted a prior serious or violent felony five-year enhancement. (Pen. Code, § 667, subd. (a).)

Before sentencing, defense counsel requested the court to exercise its discretion under Penal Code section 1385 to dismiss defendant's strike conviction under *People* v.

8

*Superior Court* (*Romero*), *supra,* 13 Cal.4th 497. The trial court denied the request and declined to dismiss defendant's strike prior.

The court sentenced defendant to an indeterminate term of 75 years to life (25 years to life for the murder, doubled as a second strike, plus 25 years to life for the firearm enhancement) on count 1 (murder), plus an indeterminate term of 19 years 8 months, as follows: The court selected the middle term of four years, doubled to eight years, for one of the child endangerment counts, deemed the principal offense; and added two years eight months (one-third the middle term of four years, or one year four months, doubled to two years eight months) for each of the two other child endangerment counts; plus one year four months (one-third the middle term of two years—i.e., eight months—doubled to one year four months) for the firearm possession offense; and an additional five-year term for the prior serious felony conviction.

Defense counsel filed a timely notice of appeal on defendant's behalf; the notice did not specify any particular ground of appeal.

## ANALYSIS

I. Factual and Procedural Background of Judge Erwood's Participation in the 1998 Case and the Present Proceedings

The computer printout of defendant's prior burglary conviction, exhibit 36, was admitted into evidence below at the court trial on the truth of the prior conviction allegations. The trial judge here, Richard A. Erwood, was a deputy district attorney in 1998, and he had made three brief appearances as a prosecutor in defendant's 1998 case.

After the preliminary hearing, defendant was held to answer on all the charges in the 1998 case. Judge Erwood first appeared as a deputy district attorney at the arraignment on the information on February 11, 1998; the arraignment was continued for one week. Judge Erwood appeared for a second time on February 18, 1998; defendant was arraigned, and he pleaded not guilty. Judge Erwood made a third appearance on March 13, 1998, an occasion when defendant was not transported to court, and which resulted in a continuance of the proceedings. Defendant later pleaded guilty, at a proceeding attended by a different prosecutor, to a single count of burglary in the 1998 case.

With respect to the present case, no one, at any time before the filing of this appeal, raised the issue that Judge Erwood had made these appearances in 1998. No statement of objection to disqualify Judge Erwood for cause was made at any time in the trial court; there is no trial court ruling on disqualification to review.

II. Statutory Provisions Concerning Disqualification of Trial Judges

Code of Civil Procedure section 170.1 provides in relevant part: "(a) A judge shall be disqualified if any one or more of the following are true: [¶] . . .[¶]

"(2) (A) The judge served as a lawyer in the proceeding, or in any other proceeding involving the same issues he or she served as a lawyer for a party in the present proceeding or gave advice to a party in the present proceeding upon a matter involved in the action or proceeding.

"(B) A judge shall be deemed to have served as a lawyer in the proceeding if within the past two years:

10

"(i)  A party to the proceeding, or an officer, director, or trustee of a party, was a client of the judge when the judge was in the private practice of law or a client of a lawyer with whom the judge was associated in the private practice of law.

"(ii)  A lawyer in the proceeding was associated in the private practice of law with the judge.

"(C)  A judge who served as a lawyer for, or officer of, a public agency that is a party to the proceeding shall be deemed to have served as a lawyer in the proceeding if he or she personally advised or in any way represented the public agency concerning the factual or legal issues in the proceeding."

Here, the salient grounds for possible disqualification are those set forth in Code of Civil Procedure section 170.1, subdivisions (a)(2)(A) and (a)(2)(C).

As to Code of Civil Procedure section 170.1, subdivision (a)(2)(A), Judge Erwood never served as a lawyer "in the proceeding" at bench.  The present proceeding did not "involv[e] the same issues" as the 1998 case, except in the sense that Judge Erwood was called upon here to exercise his discretion whether or not to dismiss the 1998 strike prior. Judge Erwood participated in the 1998 proceeding only for continuances or to stand by while the court arraigned defendant on the charge and entered defendant's not-guilty plea; the question is whether such participation amounted to giving "advice to a party in the present proceeding upon a matter involved in the action or proceeding."  (Code Civ. Proc., § 170.1, subd. (a)(2)(A).)

11

Code of Civil Procedure section 170.1, subdivision (a)(2)(B), is clearly inapplicable, both because Judge Erwood did not serve as a lawyer for a party to the current proceeding within two years of the present proceeding, and because he was not a lawyer in private practice.

As to Code of Civil Procedure section 170.1, subdivision (a)(2)(C), Judge Erwood did serve as an attorney for a public agency (Riverside County District Attorney) that is a party to the present proceeding; the issue is whether he "personally advised or in any way represented the public agency concerning the factual or legal issues in the proceeding." Again, the only connection was that Judge Erwood had formerly represented the People in 1998, for purposes of continuances or defendant's arraignment on the information in the burglary case. Then, he determined in the present proceeding whether or not to dismiss the 1998 prior burglary strike conviction.

Code of Civil Procedure section 170.3 prescribes the procedures for disqualifying a trial court judge for cause.[2] Among other things, Code of Civil Procedure

---

[2] Code of Civil Procedure section 170.3 provides in relevant part:

"(a) [¶] (1) If a judge determines himself or herself to be disqualified, the judge shall notify the presiding judge of the court of his or her recusal and shall not further participate in the proceeding, except as provided in Section 170.4, unless his or her disqualification is waived by the parties as provided in subdivision (b). [¶] . . .[¶]

"(b) [¶] (1) A judge who determines himself or herself to be disqualified after disclosing the basis for his or her disqualification on the record may ask the parties and their attorneys whether they wish to waive the disqualification, except where the basis for disqualification is as provided in paragraph (2). A waiver of disqualification shall recite the basis for the disqualification, and is effective only when signed by all parties and their attorneys and filed in the record.

"(2) There shall be no waiver of disqualification if the basis therefor is either of the following: [¶] . . .[¶]

*[footnote continued on next page]*

12

section 170.3, subdivision (b)(2)(B), provides that, when the ground of disqualification is that the judge had "served as an attorney in the matter in controversy," the disqualification may not be waived by the parties.  That is, the trial court may ask the parties to waive the disqualification, except if the alleged ground of disqualification is that the judge has a personal bias or prejudice concerning a party (Code Civ. Proc., § 170.3, subd. (b)(2)(A)), or if the ground is that the judge "served as an attorney in the matter in controversy, or the judge has been a material witness concerning that matter." (Code Civ. Proc., § 170.3, subd. (b)(2)(B).)  However, in *In re Steven O.* (1991) 229 Cal.App.3d 46, 53-55, under an earlier version of the disqualification statutes, where the ground of disqualification was that the judge had formerly served as a prosecutor in

---

*[footnote continued from previous page]*
"(B) The judge served as an attorney in the matter in controversy, or the judge has been a material witness concerning that matter.  [¶] . . .[¶]

"(4) If grounds for disqualification are first learned of or arise after the judge has made one or more rulings in a proceeding, but before the judge has completed judicial action in a proceeding, the judge shall, unless the disqualification be waived, disqualify himself or herself, but in the absence of good cause the rulings he or she has made up to that time shall not be set aside by the judge who replaces the disqualified judge.

"(c) [¶]  (1) If a judge who should disqualify himself or herself refuses or fails to do so, any party may file with the clerk a written verified statement objecting to the hearing or trial before the judge and setting forth the facts constituting the grounds for disqualification of the judge.  The statement shall be presented at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification.  [¶ . . . [¶]

"(d) The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought only by the parties to the proceeding.  The petition for the writ shall be filed and served within 10 days after service of written notice of entry of the court's order determining the question of disqualification.  If the notice of entry is served by mail, that time shall be extended as provided in subdivision (a) of Section 1013."

13

previous related proceedings, the failure to raise the disqualification challenge at any time before judgment effected a waiver of disqualification.

Code of Civil Procedure section 170.3, subdivision (d), provides that a determination as to disqualification is not an appealable order, and may only be reviewed by writ of mandate. Here, defendant never filed a statement of objection to Judge Erwood's presiding in the case, so there was never a determination made in the trial court as to the disqualification of Judge Erwood. We must first examine the consequences of this procedural posture.

III. <u>Defendant Did Not File a Timely Statement of Objection in the Trial Court</u>

In *Betz v. Pankow* (1993) 16 Cal.App.4th 931, a panel of three arbitrators decided a partnership dissolution dispute, and made an award in favor of the responding party. The award was confirmed by the trial court, and the appellant filed an appeal. While the appeal was pending, the appellant discovered that one of the arbitrators had recently retired from a law firm that had previously represented several business entities owned or controlled by the respondent. The challenged arbitrator was one of only two of the arbitrators who had signed the award; the third arbitrator had refused to sign the award for unrelated reasons. (*Id*. at p. 935.) The Court of Appeal held that "the acts of a judge subject to disqualification for cause are voidable rather than void and, by extension, [we] conclude that the same rule should apply to arbitrators. Because the actions of the challenged arbitrator in the instant case were at most voidable, and not void, the trial court properly denied appellant's motion to vacate the judgment due to its pendency on

14

appeal. [¶] However, a trial court's lack of jurisdiction to vacate a judgment while an appeal is pending creates a dilemma for the party who, with due diligence, discovers only after the notice of appeal is filed that the judge or arbitrator hearing the matter was disqualified. For the sake of judicial efficiency and economy, a party who first discovers facts during the pendency of an appeal indicating the disqualification of a judge or arbitrator should raise the disqualification issue at the earliest opportunity, rather than waiting until the appellate process is exhausted and the trial court is again vested with jurisdiction. (See, e.g., [Code Civ. Proc.,] § 170.3, subd. (c)(1); *Urias v. Harris Farms, Inc*. [(1991)] 234 Cal.App.3d [415,] 420.)" (*Betz v. Pankow*, *supra*, 16 Cal.App.4th 931, 940.)

The record here is not clear as to when defense counsel was presented with the records in defendant's 1998 burglary case. The records may have been provided earlier in discovery, or procured through counsel's own investigation, but at the very least, the documentation presented by the prosecutor at the trial of the prior conviction allegations included records that showed Judge Erwood's participation in that case. Arguably, a diligent examination of the documentation at that time would have disclosed Judge Erwood's appearances as a prosecutor on the three occasions described above. In that case, defense counsel should have filed a statement of objection to Judge Erwood in the trial court at that time, especially before the assertedly crucial *Romero* proceeding. Any attempt to file one now would be untimely. (See Code Civ. Proc., § 170.3, subd. (b)(4); *In re Marriage of M.A. & M.A.* (2015) 234 Cal.App.4th 894, 904 [a bench officer may,

15

"within 10 days of the filing or service of the statement, whichever is later, (1) order the statement stricken if the statement is untimely or, on its face, discloses no legal grounds for disqualification . . ."].)

However, even if we assume that defense counsel, acting diligently, did not reasonably discover the ground for challenging Judge Erwood until after the appeal was filed, *Betz v. Pankow*, *supra*, 16 Cal.App.4th 931, 940, indicates that the proper procedure is to file a statement of objection in the trial court, and not to raise the issue for the first time on appeal.

This analysis is supported by *People v. Barrera* (1999) 70 Cal.App.4th 541. There, the defendant was charged with check forgery with allegations that he had suffered two prior strike convictions. The trial was conducted by a commissioner who, at the outset, advised the parties that he had been a deputy public defender until his recent selection as a commissioner. As a deputy public defender, the commissioner had stood by the defendant at the defendant's arraignment on the current forgery charge while the defendant entered a not guilty plea. (*Id*. at pp. 545-546.) The commissioner advised the parties that he would be happy to reassign the case if there was any objection; he then asked the parties if they agreed to have the commissioner hear the case, notwithstanding his earlier involvement as a deputy public defender. The defendant affirmatively assented on the record, and both attorneys indicated "No problem" with the commissioner's appointment as the bench officer in the case. (*Id*. at pp. 546-547.)

16

The commissioner tried the case, and the jury found the defendant guilty of check forgery and found true the strike allegations. (*People v. Barrera*, *supra*, 70 Cal.App.4th 541, 544.) The commissioner declined to dismiss the defendant's strike priors under Penal Code section 1385 and sentenced him as a third striker. (*People v. Barrera, supra*, at pp. 552-553.) The defendant contended on appeal from the judgment that, because the ground of disqualification—serving as a lawyer for a party to the present case—was one that could not be waived under Code of Civil Procedure section 170.3, subdivision (b)(2), the judgment was void and should be set aside. The Court of Appeal held that the purported waiver or failure to object, when the ground of disqualification came within the non-waiver provision of the disqualification statutes, did not result in a void judgment (reviewable at any time), but "merely" a voidable one, "subject to the requirement of timely writ review of section 170.3, subdivision (d)." (*People v. Barrera, supra,* at pp. 548-549.)

The defendant argued that, because he had not objected below, "there was no ruling from which he could seek writ review as mandated in [Code of Civil Procedure section 170.3,] subdivision (d)." (*People v. Barrera, supra,* 70 Cal.App.4th 541, 552.) Nevertheless, the reviewing court held that the language and policy of the disqualification statutes, as amended in 1984, and again in 1990, required review solely by writ. "[A]s the Supreme Court observed, subdivision (d) 'has the dual purpose of promoting "judicial economy" and "fundamental fairness," ' both of which are fostered by the timely seeking of a writ of mandate. [Citation.] The purpose behind subdivision (d) is to secure

17

' " 'speedy review of a disqualification ruling, since permitting that ruling to be attacked later on appeal of the judgment could invalidate every ruling made by the trial court judge after the disqualification motion was denied.' " ' " (*People v. Barrera*, *supra*, 70 Cal.App.4th 541, 551, citing *People v. Brown* (1993) 6 Cal.4th 322, 333, fn. 8.) The Court of Appeal applied the same rationale to the purportedly non-waivable grounds for disqualification: "Were we to permit review on appeal in this matter, a defendant such as appellant would be able to waive the disqualification and permit the judge to preside over the entire case, secure in the knowledge that, if any portion of the result were unfavorable to him, he could appeal and obtain a reversal of the judgment and a 'second "bite at the apple," ' which would constitute an ' "intolerable windfall." ' [Citation.] The stated purpose of the amendment, to 'assure that even the shadow of bias is kept out of our courts' and to provide 'useful conformity between the judiciary's self-imposed ethical guidelines and the law,' does not outweigh the public policy considerations underlying the requirement of prompt review of the question of a disqualification which has been disclosed by the judge and waived by the parties and their attorneys." (*People v. Barrera*, *supra*, 70 Cal.App.4th 541, 551.)

We conclude, on the basis of these precedents, that even the so-called "non-waivable" grounds of disqualification in fact may be waived by conduct. In this context, the characterization of a particular ground of disqualification as "non-waivable" *means* that the court may not affirmatively request from the parties a waiver of that ground of disqualification. It does not signify any impossibility of waiver in fact by other methods.

In addition, even when the ground of disqualification has only been discovered after an appeal has been filed, the matter is governed by Code of Civil Procedure section 170.3, subdivision (d), and review is obtainable exclusively by writ after a statement of objection has been submitted to the trial court.

We recognize that, in the circumstances presented here, the prescribed remedy is unlikely to yield any cognizable relief to defendant, because any statement of objection presented at this point will be untimely. That is, any statement of objection must "be presented at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification." (Code Civ. Proc., § 170.3, subd. (c)(1).) In this case, it is unknown exactly when the "earliest practicable opportunity" arose, but any window of opportunity to file a timely statement of objection has now closed.

As defendant describes it, "Judge Erwood's conflict of interest never came up during [defendant's] case. Judge Erwood never mentioned his participation in [defendant's] prior conviction; the prosecutor in [defendant's] case did not alert Judge Erwood or trial counsel about Judge Erwood's participation in [defendant's] prior. *Nor did trial counsel file a* [*statement of objection*] *to disqualify Judge Erwood*, pursuant to section 170.1 of the Code of Civil Procedure." (Italics added.) Singularly absent is any representation about when trial defense counsel actually (or should have) discovered that Judge Erwood had participated in defendant's 1998 case. What we do know is that the documentation presented at the trial on the priors, if examined with due diligence, would have disclosed Judge Erwood's connection to that case.

19

We also note that Code of Civil Procedure section 170.3, subdivision (b)(4), provides: "If grounds for disqualification are first learned of or arise after the judge has made one or more rulings in a proceeding, but before the judge has completed judicial action in a proceeding, the judge shall, unless the disqualification be waived, disqualify himself or herself, but in the absence of good cause the rulings he or she has made up to that time shall not be set aside by the judge who replaces the disqualified judge." Strictly speaking, this subdivision is inapplicable here, because Judge Erwood has "completed judicial action" in the proceeding. It is nevertheless instructive, as evidencing an intent to leave intact the prior rulings of a judge who is later disqualified, in the absence of a showing of good cause to change those rulings. This intent is consistent with the thesis that participation in a trial by a judge who is later determined to be disqualified results in only a potentially voidable judgment, not a void one. It also comports with the public policy, expressed in *People v. Barrera*, *supra*, 70 Cal.App.4th 541, 551, that a party must act promptly, and not await the outcome of a trial in which an objection should have been timely raised. Otherwise, a party may gain an " 'intolerable windfall' " of "invalidat[ing] every ruling made by the trial court judge" by failing to file a statement of objection in a timely manner. (*Ibid.*)

20

Here, Judge Erwood made all the necessary rulings in the proceeding, and the disqualification issue was never raised. If the disqualification statutes generally mandate that previously made rulings remain intact, and if they evince a policy of prompt consideration and review to forestall a " 'second "bite of the apple" ' " (*People v. Barrera*, *supra*, 70 Cal.App.4th 541, 551), then there would be little or no purpose in filing a belated challenge after the case has been completed.

Defendant acknowledges that the failure to move for disqualification before defendant's trial was completed has forfeited the ability to raise the disqualification issue on direct appeal from the judgment. (See *People v. Carter* (2005) 36 Cal.4th 1215, 1243; *In re Steven O.*, *supra*, 229 Cal.App.3d 46, 53-55.) In *Carter*, defense counsel moved before trial to disqualify the trial judge for cause (bias), because of the trial judge's prior professional and social relationship with the prosecuting attorney. After a hearing, another judge made the determination that a reasonable person would not doubt the trial court's impartiality and denied disqualification. The defendant did not seek writ review. The failure to pursue writ review precluded any challenge to the disqualification ruling on appeal from the judgment. (*People v. Carter*, *supra*, 36 Cal.4th 1215, 1243.) In *Steven O.*, a prosecutor represented the People on an initial wardship petition. A year later, the same prosecutor sat as judge pro tempore on an allegation that the minor had violated his probation in the same case; the prosecutor also presided as judge pro tempore on additional supplemental petitions alleging new crimes. The prosecutor, sitting as judge pro tempore, ultimately revoked probation and committed the minor to the youth

authority for both old and new offenses. The minor failed to file a statement raising the disqualification at any time before proceedings had concluded. The minor had been present at both the old and the new proceedings, and was presumably aware that the same person had participated as prosecutor on the original petition, and as judge pro tempore in the supplemental proceedings. In addition, the minor's counsel had access to the records in both cases. A diligent examination of those records would have revealed the role of the judge pro tempore acting as prosecutor on the initial petition, and acting as judge pro tempore with respect to the later petitions. The failure to raise the challenge at the earliest opportunity is one way of waiving the disqualification; raising the challenge for the first time on appeal was untimely. (*In re Steven O.*, *supra*, 229 Cal.App.3d 46, 53-55.)

Despite the forfeiture of the right to raise the disqualification issue on direct appeal from the judgment, defendant now urges that his trial counsel was remiss and rendered constitutionally ineffective assistance in failing to notice that Judge Erwood had appeared on the record in the prior case, and in failing on that basis to file a statement of objection to have Judge Erwood disqualified under Code of Civil Procedure section 170.1. Defendant contends that the failure to raise Judge Erwood's disqualification was particularly problematic with respect to the court's decision in the present proceeding not to dismiss defendant's strike prior, the very case in which Judge Erwood had formerly appeared as a prosecutor. We now turn to defendant's claim of ineffective assistance of counsel (IAC).

## IV. Defendant Should Have Raised His IAC Claim by a Petition for Writ of Habeas Corpus

The federal and state Constitutions guarantee criminal defendants the right to competent representation by counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; see *People v. Vines* (2011) 51 Cal.4th 830, 875.) Under the well established principles governing claims of IAC, "[t]o prevail on [such] a claim . . , a defendant must show both that counsel's performance was deficient . . . [because] the representation fell below an objective standard of reasonableness under prevailing professional norms" and that the deficient performance was prejudicial because "there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693 [104 S.Ct. 2052, 2064, 2067-2068, 80 L.Ed.2d 674].)

"In considering such a claim, 'a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance.' [Citation.] ' " 'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' " ' [Citation.] Because the presumption of counsel's competence can typically be rebutted only with evidence outside the record, ineffective assistance claims are normally raised in habeas corpus proceedings where such evidence can be presented. [Fn. omitted.] [Citation.] A reversal on direct appeal is warranted only if '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or

omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.]" (*People v. Arce* (2014) 226 Cal.App.4th 924, 930.)

Here, the record does not affirmatively show that trial defense counsel had no rational tactical purpose for failing to challenge Judge Erwood, nor was counsel asked to provide an explanation yet failed to do so. The only available possibility is that there "simply could be no satisfactory explanation" for trial counsel's failure to file a statement of objection, challenging Judge Erwood. (*People v. Arce, supra*, 226 Cal.App.4th 924, 930.) However, there is at least one eminently satisfactory explanation for a tactical decision not to challenge Judge Erwood: defense trial counsel may have wanted Judge Erwood to preside in this case.

None of the exceptions is applicable; defendant should have raised his IAC claim via a petition for writ of habeas corpus. The claim required defendant to present evidence outside the trial record, to show if and when defense counsel received the documentation concerning defendant's 1998 prior, whether defense counsel exercised due diligence in examining those papers, and what, if any, tactical or other reason defense counsel may have had for failing to seek Judge Erwood's disqualification.

As the California Supreme Court has held, "[t]he appellate record . . . rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored."

24

(*People v. Lopez* (2008) 42 Cal.4th 960, 966; accord, *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) The same principle applies here. Defendant should have raised his IAC claim on habeas corpus, and cannot proceed with the claim on direct appeal.

V. <u>Defendant Has Failed to Demonstrate Prejudice From the Alleged IAC</u>

Even if we were to consider the merits of defendant's IAC claim, defendant is required to show both that counsel's performance was objectively deficient, and that the deficiency resulted in prejudice, i.e., a reasonable probability that, but for counsel's errors, the result would have been different. (*Strickland v. Washington, supra*, 466 U.S. 668, 688, 694 [104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674].)

As to competence, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Strickland* v. *Washington*, *supra*, 466 U.S. 668, 688 [104 S.Ct. 2052, 2064, 80 L.Ed.2d 674].) Review of counsel's performance is highly deferential, and is subject to a strong presumption that counsel's conduct falls within the range of reasonable professional assistance. (*Id*. at p. 689.)

As to prejudice, "[p]rejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 357.)

However, if a defendant's showing is insufficient on either prong, the claim of IAC fails. (*Strickland v. Washington*, *supra*, 466 U.S. 668, 697 [104 S.Ct. 2052, 2069, 80

L.Ed.2d 674].)  Thus, "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . that course should be followed." (*Ibid.*)

Here, the ground of disqualification—having served as an attorney in a prior proceeding—is not a ground that may be expressly waived by the parties.  (Cf., however, *In re Steven O.*, *supra*, 229 Cal.App.3d 46, 53-55 [failure to raise a disqualification issue is one way of waiving the right to raise the issue on appeal].)  Arguably, then, it would have been unreasonable not to have brought a motion to disqualify, had counsel been aware of Judge Erwood's participation in the 1998 case.  Against the disqualification, it might be disputed whether Judge Erwood's participation as a lawyer in the 1998 case "involv[ed] the same issues" as the current case, or whether such participation amounted to giving "advice to a party in the present proceeding upon a matter involved in the action or proceeding." (Code Civ. Proc., § 170.1, subd. (a)(2)(A).)  Similarly, it could be disputed whether Judge Erwood, in the 1998 case, "personally advised or in any way represented the public agency concerning the factual or legal issues in the proceeding." (Code Civ. Proc., § 170.1, subd. (a)(2)(C).)  In addition, the question would remain whether defense counsel may have had some tactical reason for not moving to disqualify Judge Erwood, e.g., counsel may have wanted Judge Erwood to preside.

We need not be detained by these matters, however, as defendant cannot demonstrate prejudice.  It is not reasonably probable that, even if defense counsel had

26

moved to disqualify Judge Erwood, and even if Judge Erwood's participation in the 1998 case would have warranted disqualification, the result of the *Romero* determination would have been different had it been made by any other judge. As noted, a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Jennings*, *supra*, 53 Cal.3d 334, 357.) Under that standard, a defendant must show that, absent the deficient performance, there would have been at least "a significant but something-less-than-50 percent likelihood of a more favorable verdict." (*People v. Howard* (1987) 190 Cal.App.3d 41, 48.) It should also be noted, however, that "[t]he likelihood of a different result must be substantial, not just conceivable. [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, 112 [178 L.Ed.2d 624, 647, 131 S.Ct. 770, 792].)

Defendant admits that he cannot argue that Judge Erwood abused his discretion in declining to dismiss defendant's 1998 strike conviction. He is reduced to arguing, pursuant to *Howard*, that there is a significant, if less than 50 percent, chance that another judge might have ruled differently, and dismissed his strike prior. Defendant emphasizes that his burglary strike conviction was 13 years old, and that defendant had not had any criminal convictions in the interval between that offense and the present charges. He maintains that Judge Erwood "focused much more on the nature and circumstances of [defendant's] present offenses than he did on [defendant's] priors," so that it is "probable under *Howard*'s less-than-50 percent chance that had another judge ruled . . , his prior could have been stricken."

As the California Supreme Court held in *Romero*, although the trial court retains discretion under Penal Code section 1385 to dismiss a strike allegation "in furtherance of justice," that discretion is circumscribed and limited. (*People* v. *Superior Court (Romero)*, *supra*, 13 Cal.4th 497, 530.) The California Supreme Court further clarified in *People v. Williams* (1998) 17 Cal.4th 148, that " 'furtherance of justice' " in this context requires consideration of: "the constitutional rights of the defendant, and the interests of society represented by the People," (*id*. at p. 159), and, more specifically, must consider "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Id*. at p. 161.)

The only factor that might conceivably militate in favor of dismissing defendant's strike prior is the interval (approximately 13 years) between the strike offense and the present offenses. However, the mere passage of time between strike offenses is not as significant as the defendant's conduct after the previous strike offense. (See *People* v. *Williams*, *supra*, 17 Cal.4th 148, 163.) During the interval between the prior strike and the present offenses, defendant may not have committed any new crimes, but his criminal behavior escalated dramatically with respect to the current offenses. In addition, the nature of the prior offense, burglary, was and remains a serious felony, fully within the spirit of the Three Strikes law.

Defendant's background, character, and prospects also did not place him outside the three strikes scheme of punishment. Defendant had been unemployed for an extended time, at least two years, and he did not remember when he had last worked. Defendant had very poor prospects. He had only a high school education. The court noted that defendant "was basically living off the person that he killed." Defendant had a history of mental health issues that the psychological professionals believed rendered him dangerous to the safety of others. Defendant was evaluated several times during the course of the proceedings below, and several of the evaluators found that defendant was manipulative and malingering. Defendant himself indicated that he had made his handwritten statement in part to emotionally manipulate the victim, e.g., by threatening suicide. The document itself graphically displayed an intention not only to commit suicide, but also to kill the victim. Defendant planned to kill the victim out of possessiveness and jealousy; if he could not have her, he would not let anyone else be with her.

The present offenses were particularly egregious; defendant murdered his children's mother in their presence. Under all the circumstances, it would be sheer speculation, and not a reasonable probability, that any other judge would have found that defendant fell outside the spirit of the three strikes scheme.

Defendant cannot show prejudice, and his IAC claim fails on the merits.

29

## VI. Defendant Was Not Deprived of Due Process

Defendant next recasts his claim—that Judge Erwood should have been disqualified—as a deprivation of due process.

" '[N]otwithstanding the exclusive-remedy provision of Code of Civil Procedure section 170.3, "a [party] may assert on appeal a claim of denial of the due process right to an impartial judge." [Citation.]' [Citation.] 'The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases.' [Citation.]" (*Brown v. American Bicycle Group, LLC* (2014) 224 Cal.App.4th 665, 673.) However, not every claim that a judge should have been disqualified implicates due process.

As the California Supreme Court has explained, "a statutory disqualification scheme, like that found in our Code of Civil Procedure, is not *solely* concerned with the rights of the parties before the court but is also 'intended to ensure public confidence in the judiciary.' [Citation.] [Fn. omitted.] Thus, an explicit ground for judicial disqualification in California's statutory scheme is a public perception of partiality, that is, the appearance of bias." (*People v. Freeman* (2010) 47 Cal.4th 993, 1000-1001.) However, "[b]y contrast, the United States Supreme Court's due process case law focuses on actual bias. This does not mean that actual bias must be proven to establish a due process violation. Rather, consistent with its concern that due process guarantees an impartial adjudicator, the court has focused on those circumstances where, even if actual bias is not demonstrated, the probability of bias on the part of a judge is so great as to become 'constitutionally intolerable.' [Citation.] The standard is an objective one."

30

(*Id.* at p. 1001, citing *Caperton v. A. T. Massey Coal Co.* (2009) 556 U.S. 868, 882, [129 S. Ct. 2252, 2262, 173 L.Ed.2d 1208, 1221].)

The *Freeman* court explained the objective standard to be applied by the reviewing court, as set forth by the United States Supreme Court in *Caperton*. In *Caperton v. A. T. Massey Coal Co.*, *supra*, 556 U.S. 868 [129 S. Ct. 2252, 173 L.Ed.2d 1208], a West Virginia high court justice refused to recuse himself from a case involving a $50 million damage award against a coal company whose chairman had contributed $3 million to the justice's election campaign. The justice cast the deciding vote that overturned the award. "Noting that the West Virginia justice's rejection of the petitioners' disqualification motion was based on his conclusion that he harbored no actual bias, the [United States Supreme Court] said: 'We do not question his subjective findings of impartiality and propriety. Nor do we determine whether there was actual bias.' (*Caperton*, *supra*, 556 U.S. [868] at p. [882] [129 S.Ct. at p. 2263].) Rather, the court suggested, the inherent subjectivity involved in an individual judge's examination of his or her own bias 'simply underscore[s] the need for objective rules. . . . In lieu of exclusive reliance on that personal inquiry, or on appellate review of the judge's determination respecting actual bias, the Due Process Clause has been implemented by objective standards that do not require proof of actual bias. [Citations.] In defining these standards the Court has asked whether, "under a realistic appraisal of psychological tendencies and human weakness," the interest "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be

31

adequately implemented." [Citation.]' (*Ibid.*)" (*People v. Freeman*, *supra*, 47 Cal.4th 993, 1004.)

The distinction between statutory grounds for disqualification and grounds for disqualification under the constitutional due process clause is significant. "The rule of judicial disqualification limned in *Caperton* may be complex but its application is limited. . . . [T]he protection afforded a litigant under the due process clause in the realm of judicial disqualification extends beyond the narrow common law concern of a direct, personal, and substantial pecuniary interest in a case to 'a more general concept of interests that tempt adjudicators to disregard neutrality.' [Citation.] Where such interests are present, a showing of actual bias is not required. . . . [T]he court has said that ' "what degree or kind of interest is sufficient to disqualify a judge from sitting 'cannot be defined with precision.' " ' [Citation.] Nonetheless, the court has also made it abundantly clear that the due process clause should not be routinely invoked as a ground for judicial disqualification. Rather, it is the exceptional case presenting extreme facts where a due process violation will be found. [Citation.] Less extreme cases—including those that involve the mere appearance, but not the probability, of bias—should be resolved under more expansive disqualification statutes and codes of judicial conduct. [Citation.]" (*People v. Freeman*, *supra*, 47 Cal.4th 993, 1005.)

We conclude that this case is not a rare case presenting extreme facts, and implicates only statutory disqualification concerns. As in *Freeman*, "[t]his case does not implicate any of the concerns—pecuniary interest, enmeshment in contempt proceedings,

or the amount and timing of campaign contributions—which were the factual bases for the United States Supreme Court's decisions in which it found that due process required judicial disqualification. While it is true that dicta in these decisions may foreshadow other, as yet unknown, circumstances that might amount to a due process violation, that dicta is bounded by repeated admonitions that finding such a violation in this sphere is extraordinary; the clause operates only as a 'fail-safe' and only in the context of extreme facts." (*People v. Freeman*, *supra*, 47 Cal.4th 993, 1006.)

Defendant analogizes his circumstances to two cases in which the reviewing court found that the judicial officer should have been disqualified.

First, he points to *In re Murchison* (1955) 349 U.S. 133 [75 S.Ct. 623, 99 L.Ed.942]. There, Michigan law permitted any trial court judge to "act as a so-called 'one-man grand jury.' " (*Id*. at p. 133.) The petitioners, police officers, were called by a judge, sitting as a single "judge-grand jury," and examined about an inquiry into alleged police corruption. The "judge-grand jury," finding the answers of the examinees unsatisfactory, determined that one officer must have committed perjury, and issued an order to show cause why he should not be held in contempt. The "judge-grand jury" also issued an order to show cause to the other officer for contempt for refusing to answer questions without an attorney present. At an order to show cause hearing, the "judge-grand jury" tried both officers for contempt, found them guilty, and imposed sentence. The United States Supreme Court held that, "[i]t would be very strange if our system of law permitted a judge to act as a grand jury and then try the very persons accused as a

33

result of his investigations." (*Id*. at p. 134-137.)  The court described the problem:  "As a practical matter it is difficult if not impossible for a judge to free himself from the influence of what took place in his 'grand-jury' secret session.  His recollection of that is likely to weigh far more heavily with him than any testimony given in the open hearings. . . .  [T]he judge whom due process requires to be impartial in weighing the evidence presented before him, called on his own personal knowledge and impression of what had occurred in the grand jury room and his judgment was based in part on this impression, the accuracy of which could not be tested by adequate cross-examination." (*Id*. at p. 138.)

Defendant here does not present the same circumstances.  As a former deputy district attorney, Judge Erwood had taken part in only three appearances in defendant's 1998 case:  two continuances and one arraignment, at which defendant pleaded not guilty.  There is nothing to show that Judge Erwood had both tried the earlier strike offense, and then used that knowledge in ruling on defendant's application to have the strike prior dismissed in the current proceedings.  *Murchison* is inapplicable.

Second, defendant relies on *Sincavage v. Superior Court* (1996) 42 Cal.App.4th 224; this reliance is likewise unavailing.

The initial problem is that *Sincavage* did not raise a constitutional due process claim; rather, that case involved review of a statutory disqualification claim for which the standard is higher.  (*People v. Freeman*, *supra*, 47 Cal.4th 933, 1005 [the states have adopted judicial conduct codes to eliminate even the appearance of partiality.  These

34

codes impose " ' "standards more rigorous than due process requires." ' " The due process clause provides the " 'constitutional floor' " in matters involving judicial disqualification, whereas codes of judicial conduct provide greater protection].)

In addition, *Sincavage* is distinguishable on the facts. There, the trial court judge, Judge Zuniga, presided over a 1995 trial, where the defendant was charged with drug and vehicular offenses. The information also charged the defendant with prior convictions in 1982 for robbery and attempted robbery. At the beginning of trial, the prosecutor alerted the court that, in reviewing transcripts of the 1982 trial, Judge Zuniga had acted as the calendar deputy district attorney in the courtroom where defendant's guilty pleas were taken. Another deputy district attorney had actually taken the plea. Judge Zuniga assured the defendant on the record: " 'If in fact, Mr. Sincavage, I had taken your plea, if I had prosecuted one of your cases, I would automatically recuse myself. I would not hear the case. [¶] From looking at the transcript, I merely called your case and another prosecutor and Mr. Coleman . . . from the Public Defender's Office were actually involved in the plea itself.' " (*Sincavage v. Superior Court*, *supra*, 42 Cal.App.4th 224, 227.) The defendant agreed to have the case tried by Judge Zuniga, and he was found guilty. At a separate court trial on the priors, the defendant filed a statement of objection, to disqualify Judge Zuniga for cause under Code of Civil Procedure section 170.1. Counsel had discovered, in preparing for hearing on the priors, that Judge Zuniga had actually tried the preliminary hearing in the defendant's 1982 case. Judge Zuniga filed a response, declaring that she had no recollection of the 1982 case, and that she could be

35

fair and impartial in the hearing on the priors.  Another judge denied the objection, refusing to disqualify Judge Zuniga.  (*Sincavage v. Superior Court, supra*, at p. 228.)

The defendant filed for writ review of the denial of the request to disqualify Judge Zuniga.  The Court of Appeal granted the writ of mandate, stating:  "There are two facts in this case which, taken together, lead to the conclusion that, as a matter of law, a person knowing these facts would entertain doubt that Judge Zuniga would be impartial in ruling on matters involving the priors.  The first fact is that Judge Zuniga was active in the prosecution of the priors.  The second is that Judge Zuniga herself stated, if she heard that she had acted as prosecutor in a case charged as a prior, she would automatically recuse herself.  Her statements may well have led petitioner to refrain from exercising any challenge at that time.  A doubt as to impartiality and fairness arises when the judge changes her mind upon learning the very fact which she earlier said would disqualify her."  (*Sincavage v. Superior Court*, *supra*, 42 Cal.App.4th 224, 230.)

Neither of the critical facts is present in the instant case.  There is no showing that Judge Erwood was active in the prosecution of defendant's strike prior.  Judge Erwood never made a statement, as did the judge in *Sincavage*, that he would recuse himself if it turned out that he had acted as a prosecutor in a case charged as a prior offense. *Sincavage v. Superior Court*, *supra*, 42 Cal.App.4th 224 is materially different from the instant case.

In conclusion, we find no due process violation in Judge Erwood's presiding over defendant's trial, and over the *Romero* determination not to dismiss defendant's strike

36

prior. The issue, as explained in *Freeman*, is " 'whether, "under a realistic appraisal of psychological tendencies and human weakness," the interest [in the prior proceeding] "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." ' " (*People v. Freeman*, *supra*, 47 Cal.4th 993, 1004.)

Here, there is no significant or realistic risk of bias or prejudgment. Defendant has raised, as the sole ground of disqualification, the provisions of the disqualification statute, i.e., that Judge Erwood formerly served as a public attorney (deputy district attorney) for the People in defendant's 1998 case. Judge Erwood's involvement was limited to three appearances. The appearances had occurred over a dozen years before the trial in the instant case. Two of the three appearances were non-substantive, consisting of continuances. At the third appearance, then-Deputy District Attorney Erwood stood by as defendant was arraigned and entered a plea of not guilty on a burglary charge. A different attorney represented the People in the plea proceedings that disposed of that case.

The record here fails to show that either defendant or Judge Erwood remembered or was otherwise aware of his earlier appearances in defendant's strike prior. There is also no indication that anyone—the court, either counsel, or defendant—recognized Judge Erwood's connection to the 1998 strike prior until after all the current proceedings had been concluded.

The probability of actual judicial bias under the circumstances presented here is minuscule. Defendant's due process claim must be rejected.

## DISPOSITION

Defendant forfeited the right to raise the issue of the trial judge's disqualification on direct appeal by failing to raise it at any time below and by failing to pursue writ review, the exclusive remedy for improper disqualification rulings. Defendant cannot proceed with the matter as a claim of IAC, because there is no factual record. Defendant should have proceeded by writ of habeas corpus on his IAC claim. Insofar as the IAC claim is reviewable on appeal, defendant fails to establish that he suffered any prejudice from counsel's failure to seek disqualification of the trial judge. Defendant's due process claim is unmeritorious; although such a claim may be pursued on direct appeal, it is only an extraordinary case that will present such a heightened risk of actual bias that due process requires disqualification of the judicial officer. This is not such a case.

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER

Acting P. J.

We concur:

KING

J.

MILLER

J.

38